Filed 9/29/16  P. v. Withers CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067156 |
| | D067470 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN301965) |
| DESTIN LEE WITHERS et al. | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant Destin Lee Withers.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant Jeffrey Steven McCreary.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General for Plaintiff and Respondent.

This murder case arose in February 2012 when codefendants Destin Lee Withers and Jeffrey Steven McCreary (together defendants) took the victim, Denise Rodriguez, for a drive in Withers's Mercedes-Benz, and Rodriguez, who was sitting in the back seat, was fatally shot from the front passenger's seat. Defendants were charged with first degree murder based on two theories: (1) willful, deliberate, and premeditated murder; and (2) felony murder during the commission of a kidnapping. Withers and McCreary both testified at their joint jury trial, and each indicated the other was the shooter. The court instructed the jury on aiding and abetting liability.

The jury convicted both defendants of first degree murder (count 1: Pen. Code,[1] § 187, subd. (a)). There was no special verdict to show which of the two murder theories (felony murder and willful, deliberate, and premeditated murder) the jury found the prosecution had proved beyond a reasonable doubt.

The jury determined that McCreary shot Rodriguez. Specifically, the jury found to be true the count 1 enhancement allegations in the amended information[2] that McCreary, in committing the murder, (1) was armed with a firearm and proximately caused great injury and death to Rodriguez (§ 12022, subd. (a)(1), hereafter § 12022(a)(1)); and (2) personally and intentionally discharged a firearm (§ 12022.53, subd. (d), hereafter § 12022.53(d)). The jury found the same allegations to be not true as to Withers.

---

[1] All further statutory references are to the Penal Code.

[2] The court amended the information by interlineation on June 5, 2014.

Following a bifurcated bench trial, the court found McCreary had suffered two prior strike convictions within the meaning of the Three Strikes Law (§§ 667, subds. (b)-(i), 668, 1170.12), and Withers had three prison priors (§ 667.5, subd. (b)).

The court sentenced Withers to an aggregate state prison term of 25 years to life plus three years, consisting of an indeterminate term of 25 years to life for his first degree murder conviction, plus a one-year term for each of his three prison priors.

At McCreary's sentencing hearing, the court denied McCreary's motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero* motion) to strike his two prior strike convictions. The court then sentenced McCreary to an aggregate state prison term of 100 years to life, consisting of an indeterminate term of 25 years to life for his first degree murder conviction, which the court tripled to 75 years to life under the Three Strikes Law, plus a consecutive indeterminate term of 25 years to life for the firearm enhancement (§ 12022.53(d)).

*Contentions*

Defendants separately appeal.[3] Challenging his first degree murder conviction, Withers raises four principal contentions. *First*, he contends the court breached its instructional duties when, in responding to a jury note during deliberations, it refused to tell the jury that aiding and abetting a murder cannot be predicated in and of itself on the

---

[3] In May 2015 McCreary filed a motion to consolidate his appeal (D067470) with Withers's appeal (D067156). This court issued an order that McCreary's motion to consolidate would be considered concurrently with the appeals. McCreary's consolidation motion is granted.

failure to seek or render medical aid to a shooting victim (here, Rodriguez). *Second*, he contends the jury improperly relied upon either (1) a "factually inadequate" felony murder theory that Rodriguez was murdered during a kidnapping, which Withers asserts was factually inadequate because "there was no legally adequate evidence Rodriguez was moved [into Withers's car] by force or fear"; or (2) a "legally insufficient" theory that he aided and abetted McCreary's commission of the murder by "fail[ing] to render or seek medical aid for Rodriguez" after she was shot in Withers's Mercedes. *Third*, Withers contends the court prejudicially abused its discretion and violated his constitutional rights to due process and a fair trial by permitting prosecution witness Jason Ming to testify "despite the prosecution's clear discovery violation and lack of diligence" in notifying Withers's and McCreary's counsel about the existence of this witness. In a related claim, Withers contends his trial counsel provided ineffective assistance in violation of his Sixth Amendment rights by failing to ask the court to instruct the jury with CALCRIM No. 306, which allows a jury to consider a party's failure to timely disclose evidence in violation of discovery rules when the jury evaluates the weight and significance of the evidence.

McCreary raises four principal contentions. *First*, he contends the court erred in denying his postverdict motion for the appointment of new counsel to represent him in bringing a motion for a new trial. *Second*, he contends the court's admission of "irrelevant and prejudicial evidence showing that [he] had been to prison denied [him] his right to a fundamentally fair trial, in violation of his right to due process of law." *Third*, he contends the 25-year-to-life firearm sentence enhancement imposed under section

4

12022.53(d) must be stricken because (1) the count 1 verdict form did not contain the language in that statute requiring a finding of an intentional discharge of a firearm, and thus (2) "[i]t cannot be determined beyond a reasonable doubt that each of the 12 jurors found that [he] intentionally discharged the firearm." *Fourth*, McCreary contends the court abused its discretion in denying his *Romero* motion to strike his two 1989 robbery convictions, which were strikes for purposes of the Three Strikes Law. In addition, McCreary joins the arguments Withers raises in his appeal "[t]o whatever extent the brief filed by [Withers] is applicable and beneficial to [his (McCreary's)] case."

We affirm the judgments.

FACTUAL BACKGROUND

A. *The People's Case*

1. *The Del Dios drug apartment*

Jonathan Nick Griffith, a drug user and dealer, testified for the prosecution under a grant of immunity. He had convictions for auto theft, drug possession, and being under the influence. At the time of trial in this matter, Griffith was in custody for a parole violation for possessing methamphetamine.

Griffith testified that he shared a "crash-pad" apartment (the Del Dios apartment) with a man he identified as "Vid" at an apartment complex on Del Dios Highway in Escondido that was a regular place for people to come by, hang out, and take drugs. Griffith's bedroom was the "party spot." Griffith had known McCreary, whose nickname is "Lucky," for 20 years and they were close friends. McCreary came by the apartment

5

four or five times each week, and Griffith often gave him methamphetamine because they were friends.

McCreary often carried a semiautomatic .45-caliber handgun, and he owned a bulletproof vest. McCreary acted as an "enforcer" for Griffith in connection with Griffith's various illegal activities.

David "Weasel" Renteria and Vid were friends, and Renteria would regularly hang out at the Del Dios apartment and use drugs. Renteria was a Chula Vista gang member who had been to prison for committing several assaults, including one on a police officer, and for auto theft. He was about six feet two inches tall and weighed about 230 to 240 pounds. Renteria was about two inches taller than Withers, and he was about five inches taller than McCreary and outweighed him by about 80 pounds.

2. *McCreary meets the victim, Rodriguez, on January 28, 2012, and brings her to the Del Dios apartment*

In early 2012[4] McCreary had a crush on Jackie "Looney" Bravatti. On January 28 Bravatti called McCreary and asked him to pick up Denise Rodriguez and her baby. Although McCreary did not know Rodriguez, he did as Bravatti asked, and he and Griffith drove Rodriguez and her baby to the Del Dios apartment.

McCreary and Griffith left the apartment to buy beer and when they returned Rodriguez and Renteria were in the bathroom having sex. Rodriguez and Renteria used

_____

4       The principal events from which this case arose occurred during a five-day period from January 28 to February 1, 2012, the day Rodriguez was fatally shot. All further dates are to calendar year 2012 unless otherwise specified.

6

methamphetamine together and then had sex several more times that night. The next morning Renteria told Rodriguez he was married and then he left the apartment.

After Renteria left, Griffith saw Rodriguez crying hysterically on the bed. Griffith asked her what was wrong and attempted to console her by offering her something to calm her nerves.

Griffith testified he later heard from McCreary and Withers that Rodriguez was claiming Renteria had forcibly raped her. Griffith indicated he knew Renteria had not raped Rodriguez because he had heard Renteria and Rodriguez while they were having sex in the bathroom.

3. *Withers meets Rodriguez at the Del Dios apartment on January 29*

Withers met Rodriguez at the Del Dios apartment on January 29, the day after she arrived there, when he came to the apartment complex to buy methamphetamine from Griffith. Rodriguez told Withers and McCreary she had been forcibly raped, but she did not say who had raped her.

Withers drove Rodriguez and her baby from the Del Dios apartment to his house. Kassandra Barr and Leila Penman were at Withers's house when Withers and Rodriguez arrived there. Rodriguez and the baby stayed at Withers's house with Penman. In Withers's presence Rodriguez told Penman that someone had given her a "hot shot" (bad drugs that caused her to pass out) and that men had taken turns raping her. Rodriguez later appeared to give an inconsistent story by telling Penman that one of the people who raped her was her boyfriend (Renteria).

7

Meanwhile, Withers and Barr left to see Christina Thornbrough and her then-boyfriend, Gary Cross. After Withers told them Rodriguez had been raped, she was in danger, and she and her baby needed to stay in a safe place somewhere, Cross and Thornbrough agreed to let Rodriguez and her baby stay at Thornbrough's house, where Cross was living.

4. *Withers was a trained street fighter*

Cross testified that Withers was a big, formidable guy who was very good at street fighting. Withers trained as a street fighter and did mixed martial arts. Cross referred to Withers as "Captain Save-a-Ho" because of his willingness to help women. According to Cross, the help Withers provided to women included being an "enforcer," which he did in lieu of calling the police to "square things." After Cross's niece, Michelle Lentz, was beaten by her boyfriend, Cross called Withers to protect her. Withers beat up the boyfriend and later assured Lentz the boyfriend would never bother her again.

5. *Withers's investigation regarding Rodriguez's rape and bad drugs allegations*

On January 30—the day after Thornbrough and Cross agreed to let Rodriguez and her baby stay the night with them—Withers, Barr, and Withers's friend, Christopher ("Mexican Chris"), picked Rodriguez up from Thornbrough's house and took her to the Del Dios apartment to investigate her claim she had been given bad drugs and raped. Rodriguez left her baby with Thornbrough. Barr stayed in the car while Withers, Rodriguez, and Mexican Chris went inside the apartment. Rodriguez, who was crying, sat on the couch. Withers, who appeared to be looking for Renteria and was saying he wanted to get justice, angrily went down the hall to the master bedroom, where he met

8

with McCreary, Griffith, Griffith's girlfriend Phoneny Sitaket, Mexican Chris, and Vid. Withers eventually calmed down, but still seemed concerned when Griffith told him Renteria had not raped Rodriguez. Griffith indicated that he had heard Renteria and Rodriguez having sex in the bathroom and that it was consensual.

Rodriguez continued to cry in a dramatic and exaggerated way and appeared to be seeking attention. At some point Withers's truck was towed because he had parked in a fire lane, and McCreary drove him and Barr to the tow yard. Rodriguez remained at the Del Dios apartment while Withers spent a long time recovering his impounded truck.

6. *Rodriguez calls Renteria to ask for a ride from the Del Dios apartment to her parents' home*

That same day, January 30, while Withers was trying to recover his truck, Rodriguez telephoned Renteria and asked him to give her a ride. Renteria picked up Rodriguez from the Del Dios apartment and drove her to Thornbrough's house. When they arrived, Renteria went inside to get the baby and then drove Rodriguez and her baby to Rodriguez's parents' apartment. Renteria went inside with Rodriguez, met her parents, and talked with her father. Renteria had locked his keys in his car. When he and Rodriguez's father were unable to unlock it, Renteria left the car where it was and took a taxi home.

7. *Withers's retaliatory theft of Renteria's car*

The next day, January 31, with the assistance of Gerald Gallentine, Withers and Rodriguez stole Renteria's car from the parking lot where Renteria had left it the day before. Griffith testified that Withers "took [the car] from [Renteria] for raping

9

[Rodriguez], or supposedly raping [her]."  Gallentine testified that Rodriguez said that the car they were taking belonged to her boyfriend (Renteria) and that he would be angry when he found out.  Gallentine also testified that Rodriguez gave Withers permission to take the car and that he (Gallentine) did not believe they were stealing Renteria's car.  Rodriguez also said her boyfriend would know she took the car because she knew his keys were inside it.  According to Gallentine, Withers told him not to worry because the guy had done something bad to Rodriguez.

Rodriguez rode with Withers in Renteria's car to Gallentine's house as Gallentine followed them in his car.  Later they went to Withers's house.  When they arrived, McCreary and Griffith were in Withers's master bedroom with Barr.  Withers told Rodriguez to remain in the living room with Gallentine, and then he went into his bedroom and smoked methamphetamine with McCreary and Griffith.  Rodriguez walked into the bedroom and, when she saw McCreary and Griffith, she became angry and started screaming at McCreary that she had been given bad dope and had been raped.

Withers asked Gallentine to take Rodriguez out of the bedroom and take her home.  Rodriguez would not calm down and she continued screaming and yelling.  Withers told Rodriguez, "Shut the fuck up."  He told Gallentine, "Get rid of this bitch.  Get this bitch out of here."  Gallentine testified he did not want Rodriguez in his car, so he left Withers's house without her.

Rodriguez told Withers he should not have stolen Renteria's car, and Withers replied, "What do you mean?  You're the one that told me to do this."  Rodriguez

10

continued to scream and yell, and then tried to leave, but Withers shoved her against a wall. He then took her into a bathroom for about 20 minutes.

Renteria went back with his wife to get his car from the parking lot where he had left it after locking the keys inside, but discovered it was gone. Renteria called Rodriguez, who told him, "Oh, I think you're going to be mad." Renteria testified that Withers then got on the phone, brought up Rodriguez's claim that Renteria had raped her, and told Renteria he had stolen Renteria's car in retaliation for Renteria's supposedly raping Rodriguez.

8. *Rodriguez's murder on February 1 and McCreary's disposal of her body*

Later that same day, January 31, McCreary texted Withers, "[I'm] in negotiations on a *throw away*, too little advanced notice for anything clean and my personal takes too long to clean and assemble which is why I don't usually pack backups. [T]here will be rental, but I'll throw in $60 cash towards that." (Italics added.) At trial, an investigator for the district attorney's office testified that the term "throw away" means an untraceable gun.

That night Withers drove McCreary and Rodriguez in Withers's Mercedes to the Mount Vernon Inn. They went into a room occupied by Joshua Rayborn, Rayborn's girlfriend, Monica Rodriguez (Monica), and Monica's friend, Christopher Harris. They all smoked methamphetamine. At some point something angered Withers and he threw the meth pipe they were smoking against a wall.

Sometime after midnight, February 1, Withers and McCreary left the Mount Vernon Inn and Withers drove them in his Mercedes to the Del Dios apartment to

11

confront Renteria. Rodriguez remained at the Mount Vernon Inn with Rayborn, Monica, and Harris.

Outside the Del Dios apartment, Withers and McCreary prepared themselves to beat Renteria. Withers texted Griffith to send Renteria outside, but Renteria refused to go outside.

Withers and McCreary eventually went inside the Del Dios apartment and spoke with Renteria. Griffith and Renteria were able to convince Withers and McCreary that Renteria had not raped Rodriguez, that she had consented to having sex with Renteria. Withers promised to return Renteria's car, apologized to Renteria, and they shook hands.

Renteria testified he heard Withers call the Mount Vernon Inn and say either, "Put that bitch in a corner" or "Put that bitch on the phone." Withers was now angry that Rodriguez had lied to him about being raped. Renteria testified that after Withers's phone call ended, he heard McCreary say to Withers, "I got it" or "I'll take care of it." Withers and McCreary left a few minutes later.

Withers and McCreary returned to the Mount Vernon Inn in Withers's Mercedes and got Rodriguez. Withers grabbed Rodriguez by her arm and put her in his car. Withers then got back into his car and, with McCreary sitting in the front passenger seat and Rodriguez in the backseat, he drove away from the Mount Vernon Inn.

Rodriguez was screaming and yelling, and she tried to open the car door and get out. McCreary turned around and fired four gunshots into Rodriguez.

After McCreary shot Rodriguez, Withers drove McCreary and Rodriguez's body to Withers's home. Withers went inside and came back out carrying a blanket. Barr, who

12

was staying in Withers's home, testified she saw Withers's Mercedes in the driveway with the engine idling. Barr overheard Withers, who had exited the car and walked over to the passenger's side, tell McCreary, who had moved over into the driver's seat, "Take the car" and "clean that mess." Barr had seen Withers walk out of the house and to the Mercedes with the blanket, and she saw him put the blanket in the car through the front passenger-side window. Withers told McCreary he would contact him later.

McCreary then drove Withers's Mercedes to an undeveloped cul-de-sac on Lawrence Welk Court and left Rodriguez's body there. McCreary texted Withers and told him, "I have the spot, it'll be perfect." Someone passing by on a bicycle found the body, which was wrapped in a green blanket, and called 911.

9. *Testimony of Ming and additional testimony of Gallentine*

Ming, a prosecution witness who was in custody for stealing an automobile and was testifying pursuant to a cooperation agreement with the district attorney's office, testified that he met Withers while in custody and that his cell was catty-corner from Withers's and they could see each other from their cells. He would speak with Withers during free time in the common area. Withers spoke to Ming "a lot," almost every day, about his involvement in Rodriguez's murder. Withers told Ming he was angry at Rodriguez for lying to him about being raped. Withers indicated to Ming that there was a plan to kill Rodriguez, but Withers told Ming, "The bitch wasn't supposed to get shot in my backseat." Withers told Ming that he asked McCreary on numerous occasions to "man up" and take the blame.

13

Ming also testified that Withers asked him to lie on his behalf by falsely telling Withers's investigator that he ran into McCreary on the streets after the shooting, McCreary was "strung out on drugs," and McCreary told him, "Hey, I just shot this chick in the back of [Withers's] car. [Withers] had no idea about it." Ming further testified that Withers told him he grabbed Rodriguez by her arm and put her in his car.

During the trial in this matter, Gallentine, like Ming, was in custody and testified for the prosecution pursuant to a cooperation agreement with the district attorney's office. Gallentine testified that when McCreary drove Withers's Mercedes to Gallentine's house and Gallentine agreed to take possession of the car, McCreary spoke to him about someone's having been murdered in the car, but McCreary did not tell Gallentine who had been murdered. McCreary showed Gallentine a bullet hole in the car. McCreary asked Gallentine, "Did [Withers] tell you what's up?" Gallentine testified that when he asked McCreary what he meant, McCreary replied, "I blasted somebody in the back" or "I blasted someone in the backseat."

Gallentine also testified he was taken into custody in July 2013, and he indicated that his cell was near Withers's. While they were in custody, Withers asked Gallentine to lie on his behalf. Specifically, Withers asked him to tell Withers's investigator that when McCreary came to his house, McCreary said, "I shot this girl; Withers didn't know anything about it." Gallentine testified that he got the impression from talking with Withers that Withers was in the car when Rodriguez was killed. Gallentine also testified that Withers told him Rodriguez was trying to open the car door and get out of the car before she was shot.

14

10. *Defendants' arrests and their recorded incriminating statements*

Shortly after midnight on February 2, Withers was detained during a traffic stop and following a search of his vehicle and his person he was arrested for being a felon in possession of ammunition. Later at the police station Withers calmly told the arresting officer he wanted to provide information about a homicide. Escondido police detectives were notified.

On February 3 Withers placed a recorded and transcribed telephone call to McCreary, who implicated himself as the person who shot Rodriguez. During the call, Withers asked McCreary about his (Withers's) car. Withers then asked McCreary, "You didn't put fuck, you didn't put any bullet holes in my shit, did you?" McCreary replied, "There, there, there was, there was one, that, um, I, I, I started working on it . . . ." Withers then confronted McCreary about the four gunshots McCreary fired inside Withers's Mercedes during the murder: "Fuck, you didn't have to fuckin' shoot four fuckin' times, idiot. That was crazy." McCreary replied: "No, no I didn't. I didn't. I know, I know I don't either. Um, I used to do a real quick double but uh, um . . . I don't know, I don't know what happened." Indicating he (Withers) was driving when McCreary shot Rodriguez, Withers then told McCreary: "Yeah I [was] fucking . . . driving on the fuckin' side of the road and all of a sudden you fucking pop four rounds, I was like holy shit." McCreary responded by laughing.

McCreary was arrested the next day, February 4, while he was driving Withers's other vehicle, a Ford Explorer.[5]  One of the arresting officers, San Diego County Sheriff's Deputy Juan Lozoya, testified that when he activated the red emergency lights and siren on his unmarked vehicle, the Ford Explorer McCreary was driving swerved and accelerated during what Deputy Lozoya indicated were evasive maneuvers.  When McCreary accelerated again and turned into the driveway of an apartment complex, both wheels on the passenger side of the Ford Explorer came off the ground.  McCreary stopped when the Explorer bounced back on all four wheels and approached a rolling wrought iron gate.

The officers instructed McCreary, who was looking outside the driver's side door of the Explorer, to get on the ground but McCreary did not comply.  McCreary resisted as the officers pulled him out of the Explorer and onto the ground, and he continued to struggle after he was on the ground.  Deputy Lozoya testified that when McCreary went down to the ground, he pulled both of his hands in towards his waistband and underneath his stomach as he lay face down on the ground.  Deputy Lozoya instructed McCreary to get both of his hands out and behind his back.  Deputy Lozoya grabbed McCreary's left hand and attempted to pull it out from under McCreary, but McCreary continued to resist.

---

[5]    Police detectives found Withers's Mercedes at Gallentine's house.  Gallentine testified that McCreary unexpectedly brought the Mercedes to his house after Withers was arrested, and Gallentine allowed McCreary to take Withers's Ford Explorer, which was in Gallentine's possession.

16

Eventually the officers were able to subdue and handcuff McCreary. One of the officers, who was conducting a pat down of McCreary's person, asked McCreary whether he had any weapons on him, and McCreary replied, "The gun's in the car."

11. *Ballistics evidence*

Expert testimony by a criminalist established that the nine millimeter FEG semiautomatic handgun the police found in the Ford Explorer McCreary had been driving immediately prior to his arrest matched the bullets that were recovered from Rodriguez's body.

12. *Autopsy and forensic re-creation of the shooting*

Bethann Schaber, M.D., a forensic pathologist, testified that an autopsy determined the cause of Rodriguez's death was multiple gunshot wounds to her upper torso. Specifically, three bullets entered Rodriguez's body through the back of her right shoulder and went through her chest cavity, injuring both of her lungs and large blood vessels coming off of the heart, including the aorta and the pulmonary artery. One of the bullets went through her spine. Two of the bullets were found inside Rodriguez's body, and one was found at the scene when it fell out of Rodriguez's clothing and stayed after exiting her body.

Working with a criminalist from the San Diego County Sheriff's Regional Crime Lab who was a firearms expert, Dr. Schaber participated in a simulated re-creation of the shooting inside the Mercedes to determine Rodriguez's position when she was shot. Dr. Schaber testified that she handled the body positioning aspect of the re-creation, and the firearms expert handled the bullet trajectory aspect. A female model, who pretended to

17

be Rodriguez and whose height was about the same as Rodriguez's, sat in the back seat of the Mercedes during the re-creation of the shooting. Dr. Schaber determined that in order for Rodriguez to be shot through the back of her right shoulder by someone in the front passenger seat, she had to be twisted to some degree in her upper body towards the car door. Dr. Schaber indicated it was possible Rodriguez was holding onto the door handle when she was turned towards the door and was shot.

B. *Defenses*

Withers and McCreary both testified. Each indicated there was no plan to kill Rodriguez when she got into Withers's Mercedes with them and they left the Mount Vernon Inn. They both indicated Rodriguez willingly got into the Mercedes. Each testified that the other shot Rodriguez, who was in the back seat, from the front passenger seat. Each indicated that the other's shooting of Rodriguez was unexpected and that they each feared the other after Rodriguez was shot.

DISCUSSION

I. *WITHERS'S APPEAL*

A. *Claim of Instructional Error*

Withers, joined by McCreary, contends the court breached its instructional duties when, in responding to a jury note during deliberations, it refused to tell the jury that aiding and abetting a murder cannot be predicated in and of itself on the failure to seek or render medical aid to a shooting victim (here, Rodriguez). We reject this contention.

18

1. *Background*

a. CALCRIM Nos. 400, 401, 521 and 540A

The court instructed the jury that Withers and McCreary were both charged in count 1 with first degree murder under two theories, each of which had different requirements: (1) willful, deliberate, and premeditated murder; and (2) felony murder. The court instructed the jury with CALCRIM No. 521 on the theory of willful, deliberate, and premeditated murder; and it instructed the jury with CALCRIM No. 540A on the theory of felony murder.

Of particular importance here, the court also gave two instructions on aiding and abetting. First, it instructed the jury with a modified version of CALCRIM No. 400 on the general principles of aiding and abetting. Second, it gave CALCRIM No. 401, which explained the elements the prosecution was required to prove to establish that a defendant was guilty of a crime based on the theory of aiding and abetting, and which also informed the jury that "the fact that a person is present at the scene of a crime or *fails to prevent the crime* does not, *by itself*, make him an aider and abettor."[6] (Italics added.)

---

[6]     The court's instruction under CALCRIM No. 401 stated: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] [(1)] The perpetrator committed the crime; [¶] (2) The defendant knew that the perpetrator intended to commit the crime; [¶] (3) Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND [¶] (4) The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an

19

b. *Jury's note with three questions and the court's response*

The jury started deliberating on June 10 in the afternoon. The following afternoon, the jury sent to the court a note with three questions, the first of which pertained to aiding and abetting and is at issue here:

> "1) *If a person does not seek help for the victim of a criminal shooting and that victim dies, does that in and of itself constitute aiding and abetting the crime*?

> "2) If the perpetrator of a crime points a gun at the victim who has consented to be in that place up to that point, and that victim reacts to the threat of the gun by turning to leave the . . . area, does that reaction by the victim establish kidnapping on the part of the perpetrator?

> "3) Does the act of <u>deciding</u> to kill someone, whether under chaotic circumstances or non-chaotic circumstances, constitute premeditation?" (Italics added.)

Outside the presence of the jury, Withers's counsel requested that the court answer the jury's question about aiding and abetting as follows: "No, the law does not impose an affirmative duty to act."

After discussing with all counsel how it should respond to the jury's questions, the court sent a written response to the jury. The court's response first told the jury, "You must decide what the facts are, then follow the law as I explained it to you." Addressing the jury's aiding and abetting question, the court's response referred the jury back to the aiding and abetting instructions, stating, "Please see CALCRIMS 400 and 401."

---

aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, *the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor*." (Last italics added.)

20

c. *Applicable legal principles*

i. *Aiding and abetting liability*

A person incurs criminal liability as an aider and abettor when he or she (1) by act or advice, aids, promotes, encourages, or instigates the *commission* of a crime; (2) with knowledge of the perpetrator's unlawful purpose; and (3) with the intent or purpose of committing, encouraging, or facilitating the *commission* of the crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, italics added.)

ii. *Duty to instruct on relevant principles of law*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and . . . necessary for the jury's understanding." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

iii. *Section 1138*

A deliberating jury's request for information about a point of law that has arisen in the case triggers section 1138, which provides: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ."

Section 1138 imposes on the trial court a mandatory duty "to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another point as indicated in *In re Steele* (2004) 32 Cal.4th 682, 690.) However, the California Supreme Court has explained that "[t]his does not mean the court must always elaborate on the standard instructions. *Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.*" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*), italics added.)

iv. *Standard of review*

We generally review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) However, "[a]n appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

On appeal we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976, superseded by statute on other grounds.)

d. *Analysis*

As noted, the jury asked the court, "If a person does not seek help for the victim of a criminal shooting and that victim dies, does that in and of itself constitute aiding and abetting the crime?" Defendants claim the court prejudicially breached its instructional

22

duties under section 1138 and violated their constitutional rights to due process and a fair trial in responding to the jurors' question by referring them back to the court's original aiding and abetting instructions.

We conclude the court did not abuse its discretion under section 1138, and it did not violate Withers's and McCreary's constitutional rights to due process and a fair trial when it responded to the jury's aiding and abetting question by directing the jury back to the court's original aiding and abetting instructions, CALCRIM Nos. 400 and 401.  As already discussed, the California Supreme Court has explained that a trial court is not required to "always elaborate on the standard instructions," and, "[w]here the original instructions are themselves *full and complete*, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information."  (*Beardslee*, *supra*, 53 Cal.3d at p. 97, italics added.)

Here, for purposes of section 1138, the court's original aiding and abetting instructions, CALCRIM Nos. 400 and 401, were full and complete.  The jurors' question at issue here indicated they were confused about aider and abettor liability.  Their third question─"Does the act of <u>deciding</u> to kill someone, whether under chaotic circumstances or non-chaotic circumstances, constitute premeditation?"─suggested they were either not fully attentive to the court's instructions or were having difficulty finding the relevant instructions in the substantial packet of instructions they had been given.  Thus, it was reasonable for the court to conclude it could clear up the jurors' confusion about aider and abettor liability by directing their attention to the relevant instructions on that issue, CALCRIM Nos. 400 and 401.  Those instructions are correct statements of the law on

23

aiding and abetting liability. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 [CALCRIM No. 400]; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103-1104 [CALCRIM No. 401].) CALCRIM No. 401 properly answered the jury's aiding and abetting question by explaining that "[t]o prove that the defendant is guilty of a crime based on aiding and abetting that crime," the People were required to prove (among other things) that "[*b*]*efore or during the commission of the crime*, the defendant intended to aid and abet the perpetrator in committing the crime" (italics added). That instruction also explained that "[s]omeone *aids and abets* a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's *commission* of that crime." (CALCRIM No. 401, last italics added.) The foregoing instructions preclude a finding of aiding and abetting liability for mere after-the-fact actions (or inactions) following the commission of a crime. The requisite intent must be to "aid, facilitate, promote, encourage, or instigate the perpetrator's commission of [the] crime," and the defendant must have intended to aid and abet the perpetrator in committing the crime "[*b*]*efore or during* the commission of the crime" (italics added), *not after* the commission of the crime. (CALCRIM No. 401, italics added.) Thus, the original instructions properly informed the jury they could not find a defendant liable for aiding and abetting a crime based upon a defendant's act or failure to act *after* the commission of the crime.

The uncontested testimony by the prosecution's forensic pathologist, Dr. Schaber, established that the shooter, whom the jury found was McCreary, fatally wounded Rodriguez by firing three bullets through the back of her right shoulder, and the bullets

24

went through her chest cavity, injuring both of her lungs and large blood vessels coming off of the heart, including the aorta and the pulmonary artery. One of the bullets also severed her spine. From the foregoing undisputed evidence and the nature of the fatal gunshot trauma, any rational jury could conclude Rodriguez did not survive for any appreciable amount of time after she was shot, and thus the murder was committed either at the moment Rodriguez was shot or within an inappreciable period of time thereafter.[7] Defendants have acknowledged Rodriguez did not survive for any appreciable amount of time after she was shot. Specifically, McCreary's counsel stated during her closing arguments at trial that "the evidence is unrefuted that [Rodriguez] died instantly." On appeal, Withers acknowledges that "the record does not contain substantial evidence to support a theory Rodriguez was alive for any appreciable time after she was shot," and he concedes "there was certainly no evidence of any medical treatment that could have made a difference."

The court's original instruction under CALCRIM No. 401 properly answered the jurors' question about aiding and abetting liability based upon a failure to seek medical aid for a murdered shooting victim (here, Rodriguez) by informing them they could not find a defendant aided and abetted the murder based upon the defendant's conduct (such as the failure to seek medical aid for the victim) *after* the murder was committed. Thus, the court did not err in answering the jurors' question by referring them back to CALCRIM Nos. 400 and 401.

---

[7]    Dr. Schaber indicated that neither she nor her office was asked to determine when Rodriguez died.

Furthermore, we presume the jury in this case understood and applied the instructions on aiding and abetting liability that the court gave under CALCRIM Nos. 400 and 401 (see *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption. On the contrary, the record shows that during the remainder of the jury's deliberations, it sent two more notes to the court but did not ask any additional questions about aiding and abetting liability.

B. *Sufficiency of the Evidence of Kidnapping and Withers's Reiterated Claim of Instructional Error* (*Aiding and Abetting*)

Withers and McCreary next contend their first degree murder convictions must be reversed because the jury improperly relied upon either (1) a felony murder theory that Rodriguez was murdered during a kidnapping, which Withers asserts was "factually inadequate" because "there was no legally adequate evidence Rodriguez was moved [into Withers's car] by force or fear." Withers reasserts his claim that the jury improperly relied upon a "legally inadequate" theory that he aided and abetted McCreary's commission of the murder by "fail[ing] to render or seek medical aid for Rodriguez" after she was shot. We reject these contentions.

1. *Applicable legal principles*

a. *Kidnapping*

Section 207, subdivision (a) defines kidnapping and provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

26

"In order to establish a kidnapping under section 207, subdivision (a), the prosecution must prove "'(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance."'" (*People v. Arias* (2011) 193 Cal.App.4th 1428, 1434.)

b. *Section 1111.5 (corroboration requirement for testimony of in-custody informants, here Ming and Gallentine)*

Section 1111.5, subdivision (a), which requires corroboration of testimony given by in-custody informants, provides in part: "A jury . . . may not convict a defendant . . . based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that *connects the defendant with the commission of the offense* . . . . Corroboration is not sufficient if it merely shows the commission of the offense . . . . Corroboration of an in-custody informant shall not be provided by the testimony of another in-custody informant unless the party calling the in-custody informant as a witness establishes by a preponderance of the evidence that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony."

Subdivision (b) of section 1111.5 defines an "in-custody informant" as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution." Thus, to qualify as an in-custody informant within the

27

meaning of section 1111.5, the informant must testify about a defendant's statements made while both the informant and defendant were incarcerated.

c. *Standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

2. *Analysis*

As already noted, one of the theories upon which defendants were charged with the first degree murder was felony murder during the commission of a kidnapping.

Defendants contend their first degree murder convictions must be reversed because there was insufficient evidence to establish that Rodriguez was unlawfully moved by the use of force or fear without her consent, and thus the evidence was insufficient to support a finding she was killed in Withers's Mercedes during the course of a kidnapping.

Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude the prosecution presented substantial evidence, predominantly circumstantial in nature, from which a reasonable trier of fact could find beyond a reasonable doubt that defendants unlawfully moved Rodriguez through the use of force or fear without her consent and, thus, that she was killed inside Withers's Mercedes during the course of a kidnapping. The evidence shows that before they put Rodriguez in the Mercedes at the Mount Vernon Inn, defendants, after they learned Rodriguez lied about being raped by Renteria, placed her under their control and told people at the Mount Vernon Inn to not allow Rodriguez to leave. Specifically, the prosecution presented evidence that on the night of January 31, a few hours before Rodriguez was shot, Withers drove McCreary and Rodriguez to the Mount Vernon Inn. Sometime after midnight on February 1, Withers and McCreary left the Mount Vernon Inn and Withers drove to the Del Dios apartment to confront Renteria about Rodriguez's claim that Renteria had raped her. Rodriguez remained at the Mount Vernon Inn with Rayborn, Monica, and Harris.

Griffith testified he was with Renteria at the Del Dios apartment, and he (Griffith) convinced Withers and McCreary that Renteria had not raped Rodriguez. Withers was angry that Rodriguez had lied to him about being raped. Renteria also testified he heard

29

Withers call the Mount Vernon Inn and say either, "Put that bitch in a corner" or "Put that bitch on the phone." A few minutes later Withers and McCreary returned to the Mount Vernon Inn to get Rodriguez. Ming testified Withers told him that Withers grabbed Rodriguez by her arm and put her in his car. Gallentine testified Withers told him that Rodriguez was screaming and yelling and she tried to open the car door and get out before she was shot.

Substantial circumstantial evidence also shows that by the night of Rodriguez's murder, Withers and McCreary had formulated a plan to kill her. The prosecution presented evidence that at 6:50 p.m. on January 31, a few hours before Rodriguez was shot, McCreary texted Withers that he was negotiating to rent a "throw away." An investigator for the district attorney's office testified that the term "throw away" means an untraceable gun. Renteria's testimony shows that when he and Griffith met with Withers and McCreary that night, and after Withers finished calling someone at the Mount Vernon Inn and said either, "Put that bitch in a corner" or "Put that bitch on the phone," he (Renteria) heard McCreary say to Withers, "I got it" or "I'll take care of it."

As noted, defendants challenge the sufficiency of the evidence showing Rodriguez was killed during a kidnapping. Withers, joined by McCreary, asserts that (1) Ming's testimony that Withers told him Withers grabbed Rodriguez by her arm and put her in his car was "legally insufficient to show Rodriguez entered the [Mercedes] by force or fear without her consent" because this testimony was uncorroborated by independent evidence as required by section 1111.5, and (2) Gallentine's testimony did not corroborate Ming's statements. These assertions are unavailing.

30

As already discussed, section 1111.5 requires that testimony given by an in-custody informant (like Ming) "be corroborated by other evidence that *connects the defendant with the commission of the offense*."  (§ 1111.5, subd. (a), italics added.)

We need not decide whether Ming's testimony—that Withers told him Withers grabbed Rodriguez by her arm and put her in his car—was corroborated by independent evidence as required by section 1111.5. because, even without Ming's testimony, a reasonable trier of fact could find beyond a reasonable doubt from the remaining substantial evidence discussed, *ante*, that (1) defendants unlawfully moved Rodriguez through the use of force or fear without her consent; and, thus, (2) she was killed inside Withers's car during the course of a kidnapping.  We note that Gallentine's in-custody informant testimony—that Withers told him Rodriguez tried to open the car door and get out before she was shot—is sufficiently corroborated by the expert forensic testimony of Dr. Schaber.  Dr. Schaber testified she determined during the re-creation of the shooting that in order for Rodriguez to be shot through the back of her right shoulder by someone in the front passenger seat, she had to be twisted to some degree in her upper body towards the car door.  Dr. Schaber's testimony that it was possible Rodriguez was holding onto the door handle when she was turned towards the door and was shot is consistent with Gallentine's testimony that Withers told him Rodriguez tried to open the car door and get out before she was shot.  We conclude Dr. Schaber's testimony independently corroborates Gallentine's testimony.

Withers also reasserts his claim that the jury improperly relied on a "legally insufficient" aiding and abetting theory that he aided and abetted McCreary's commission

31

of the murder by "fail[ing] to render or seek medical aid for Rodriguez" after she was shot. We have rejected this claim for reasons discussed, *ante*.

C. *Admission of In-Custody Informant Ming's Testimony*

Last, Withers, joined by McCreary, contends the court prejudicially abused its discretion and violated their constitutional rights to due process and a fair trial by permitting prosecution witness Ming to testify "despite the prosecution's clear discovery violation and lack of diligence" in notifying Withers's and McCreary's counsel about the existence of this witness. In a related claim, Withers contends his trial counsel provided ineffective assistance in violation of his Sixth Amendment rights by failing to ask the court to instruct the jury with CALCRIM No. 306, which allows a jury to consider a party's failure to timely disclose evidence in violation of discovery rules when the jury evaluates the weight and significance of the evidence. We reject these contentions.

1. *Background*

Trial proceedings in this case began on May 6, 2014. The next day, the court continued the trial to May 12, and the prosecution's first witness testified on that date. Sometime thereafter the prosecutor in this case, Jodi Breton, received information from another prosecutor in her office that, according to Ming's counsel,[8] Ming might want to provide testimony in this case, but that prosecutor had no information about what Ming wanted to provide. Breton asked that Ming's counsel provide her with an offer of proof, but the information she received back was very vague.

---

[8]     Phil Walden.

32

Late in the day on Thursday, May 22 of that year—during the People's case-in-chief—prosecutor Breton again learned, this time through Ming's counsel and her division chief, that Ming had information about this case, but she still did not receive any specifics about what that information was.

That evening, the prosecutor contacted Ming's counsel in an effort to obtain more specifics about Ming's information. Again, Ming's counsel could not provide anything of substance about what information Ming had about this case. That same evening the prosecutor arranged with Ming's counsel for her to interview Ming the next day, May 23, which was the Friday before Memorial Day.

The next morning, Friday, May 23, the court was dark; and the prosecutor and Detective Troy DuGal of the San Diego County Sheriff's Department interviewed Ming with Ming's counsel present. Detective DuGal video recorded the interview, which ended at about 1:00 or 2:00 that afternoon. He had to return to his office to download the interview and make copies because he did not have the necessary equipment at the prosecutor's office, and this prevented the prosecutor from immediately providing a copy to defendants' counsel.

During the Friday interview the prosecutor determined that Ming had a tremendous amount of information about this case, including that he had been housed in a cell next to Withers's for two to three months and that Withers had spoken extensively to him about Rodriguez's murder. After the interview, either later that day or the next morning (Saturday, May 24), the prosecutor notified defendants' counsel she would be providing to them a recording of the interview. The prosecutor met with both counsel on

33

Saturday and provided them with copies of the audio version of the recording of Ming's interview she had received from Detective DuGal earlier that morning.

Detective DuGal worked over the weekend and on the Memorial Day holiday (Monday, May 26) and prepared a report. The prosecutor gave Detective DuGal's report to defendants' counsel on Tuesday, May 27.

On Tuesday, May 27, 2014, over the objection of Withers's counsel[9] and following a hearing during which the prosecutor presented the foregoing facts, the court granted the prosecutor's request to present Ming's testimony during the People's case-in-chief. Indicating that the trial originally had been set to begin in the fall of 2013 but it had been continued a couple of times because Withers had talked about this case to other people while in custody and against his counsel's advice, the court denied Withers's request for a two- or three-week continuance. Ming testified the next day.

2. *Applicable legal principles*

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies."'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280 (*Verdugo*).) "Evidence subject to disclosure includes . . . any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of

---

9       McCreary's counsel did not object to the admission of Ming's testimony.

34

experts' ([(§ 1054.1], subd. (f)) . . . ."  (*Id.* at p. 280.)  "'Absent good cause, such evidence must be disclosed at least 30 days before trial, or *immediately if discovered or obtained within 30 days of trial.*  (§ 1054.7.)'"[10]  (*Ibid.*, italics added.)

a.  *Standard of review*

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."  (*People v. Waidla, supra,* 22 Cal.4th at p. 723.)  We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

"A violation of section 1054.1 is subject to the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836."  (*Verdugo*, *supra*, 50 Cal.4th at p. 280.)  Under the *Watson* standard, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error."  (*Watson*, p. 836.)

3.  *Analysis*

Defendants' claim that the court prejudicially abused its discretion and violated their constitutional rights to due process and a fair trial by permitting Ming to testify is

---

10    Section 1054.7 provides in part:  "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred.  If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred."

premised on their contention that the prosecutor violated her statutory discovery disclosure obligations under section 1054.7 by failing to diligently disclose to the defense in a timely manner that Ming would be a witness for the People at trial. This contention must be rejected because it is not supported by the record.

Under section 1054.7, absent good cause, mandated disclosures must be made by the prosecution at least 30 days before trial or "immediately" if the material and information becomes known to, or comes into the possession of, the prosecutor within 30 days of trial. (§ 1054.7; see *Verdugo*, *supra*, 50 Cal.4th at p. 280.) Defendants cite no authority, and we are aware of none, that imposes on a prosecutor a duty to immediately interview any person who may want to testify in a case.

Here, as already discussed, the record shows that, within a few days after the first witness testified on May 12, 2014, the prosecutor became aware that Ming might want to testify in this case. Defendants complain that "it was not until the prosecutor's supervisor got involved on May 22, 2014, that she took any real action," and the next day she was able to interview Ming and discover he had a tremendous amount of information about this case.

We conclude defendants have failed to meet their burden of demonstrating the prosecutor violated her statutory disclosure obligations under section 1054.1 and 1054.7. The record shows that when the prosecutor initially learned that Ming might want to testify, she was diligently presenting her case-in-chief. Notwithstanding this constraint, the prosecutor attempted unsuccessfully to learn the substance of whatever information Ming possessed. She asked that Ming's counsel provide her with an offer of proof, but

36

the little information she received back was very vague.  Later, in the morning on Friday, May 23, 2014—when the court was not in session and the three-day Memorial Day weekend was about to begin—the prosecutor, taking advantage of the break in the trial, interviewed Ming with Detective DuGal to determine whether Ming had anything relevant or believable to say.  The very next morning, Saturday, May 24, 2014, the prosecutor met with defendants' counsel and provided them with copies of the audio version of the recording of Ming's interview she had received from Detective DuGal earlier that morning.  Detective DuGal worked over the weekend and on the Memorial Day holiday (Monday, May 26) and prepared a report.  The prosecutor gave Detective DuGal's report to defendants' counsel on Tuesday, May 27.

Jailhouse informants are notoriously unreliable.  Thus, the prosecutor's decision not to immediately interview Ming when she first learned Ming might want to testify, was reasonable.  The prosecutor did quickly ask Ming's attorney for additional information, and her decision to not spend valuable additional time during the presentation of her case-in-chief was understandable.  When the prosecutor learned Ming's information was relevant, she immediately arranged to provide the recording of Ming's interview and Detective DuGal's report to defendants' counsel.  Accordingly, we conclude defendants' discovery violation claim fails and the court did not abuse its discretion in denying Withers's request for a continuance.

We also conclude Withers's related claim of ineffective assistance of counsel fails.  As noted, Withers contends his trial counsel provided ineffective assistance by failing to ask the court to instruct the jury with CALCRIM No. 306, which allows a jury to

37

consider a party's failure to timely disclose evidence in violation of discovery rules when the jury evaluates the weight and significance of the evidence.  This contention is unavailing.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)  To show prejudice, the defendant must show a reasonable probability a more favorable result would have been received had counsel's performance not been deficient.  (*Strickland*, at p. 694; *Ledesma*, at pp. 217-218.)

Here, Withers's ineffective-assistance-of-counsel claim is premised on his assertion that the prosecutor violated her statutory disclosure obligations under section 1054.1 and 1054.7.  For reasons discussed, *ante*, we have concluded the prosecutor did not violate those disclosure obligations.  Accordingly, Withers's counsel had no duty to ask the court to instruct the jury with CALCRIM No. 306, and Withers's claim of ineffective assistance of counsel necessarily fails.

## II.  *MCCREARY'S APPEAL*

### A.  *McCreary's Postconviction Motion for New Counsel*

McCreary contends the court erred in denying his postverdict motion for the appointment of new counsel to represent him in bringing a motion for a new trial.  We reject this contention.

1. *Background*: *McCreary's Marsden*[11] *motion and his related motion for new counsel to represent him in presenting a new trial motion*

In late January 2015, about six months after the jury returned its verdicts and shortly before McCreary's sentencing hearing, the court conducted a *Marsden* hearing at the request of McCreary's trial counsel, Cassandra Kinchen. (1MCT 76 [6/13/14 verdicts]; 2MCT 560 [1/28/15 sentencing]; 3RT 2388:8-9; 30RT 4000:13-18; see RT vol. 30-A ["30-ART"] 4001-4026 [sealed RT of *Marsden* hearing in reddish-orange envelope in McCreary's doghouse])! Both McCreary and Kinchen were present; the prosecutor was not. McCreary indicated he wanted the court to appoint new counsel to represent him, and he told the court Kinchen would not do "a few things" he wanted her to do.

At the court's invitation and with McCreary's acquiescence, Kinchen then spoke on McCreary's behalf and informed the court that he wanted her to file a motion for a new trial based on several grounds, but she had conducted an investigation and had decided not to pursue such a motion. The court asked Kinchen, "Why is that, because you feel there is no legal merit or what?" Kinchen responded, "Well, I can't say no legal merit. I would simply say strategic decisions would indicate I would not have used certain information."

Kinchen then described the five principal issues McCreary wanted to raise in a new trial motion: (1) a defense witness Kinchen knew about but decided not to call at trial came forward after the verdict with additional information McCreary thought was important; (2) as the jury was about to return its verdicts following the month-long trial,

---

11    *People v. Marsden* (1970) 2 Cal.3d 118.

McCreary belatedly recognized one of the male jurors, whose name he did not know, as a customer with whom he had interacted at a store where he had worked, and who McCreary believed might have harbored ill will towards him; (3) Kinchen objected but, for tactical reasons, did not ask the court to admonish the jury during the prosecutor's cross-examination of McCreary near the end of the trial when the jury was mistakenly shown an unredacted transcript of his police interview and heard the corresponding audio recording that made one reference to McCreary's having served time in prison; (4) Kinchen did not object and seek an admonishment during the prosecutor's closing arguments when the prosecutor reenacted, in a manner McCreary thought was overly passionate, what the prosecutor thought the victim, Rodriguez, was doing and saying in the back seat of Withers's car; and (5) Kinchen failed to object to evidence at trial regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing that she died immediately when she was shot.

Kinchen then told the court, "[M]y decision not to file a motion for new trial is based on my investigation, and also my interpretation of the information." She stated that her "not objecting, not having the jury admonished that close to the end of trial was a strategic decision." She explained, "I can't very well file a motion to protest my own strategic decision. However, another attorney could possibly review the same information and decide to proceed with the information. They could decide to proceed with that witness, when I did not. They could decide that the jury should have been admonished when I did not. [¶] [F]or that reason, I can't file a motion, but perhaps another attorney can."

The court asked McCreary whether Kinchen had "cover[ed] the grounds" he believed required the filing of a new trial motion. McCreary replied, "It was perfect." The court then asked McCreary, "So she's a good attorney?" McCreary answered, "Yes."

The court then asked Kinchen about her qualifications and experience as a criminal defense attorney. Kinchen replied that she had worked about 24 years as a criminal defense attorney for the public defender's office, and she had done at least 100 trials.

In addition to the five grounds he asserted for a new trial motion, McCreary also complained that Kinchen had not communicated enough with him prior to trial to prepare him for testifying, and he disagreed with Kinchen's decision not to provide him with one of his statements until shortly before his cross-examination by the prosecutor so that his testimony would not appear rehearsed.

The court solicited additional information from both Kinchen and McCreary regarding McCreary's *Marsden* request for appointment of new counsel. Kinchen informed the court she had discussed McCreary's testimony with him before he testified, she went over the areas she would go into on direct examination, and she let McCreary know the prosecutor's cross-examination would be "pretty aggressive" if he chose to testify. She reminded McCreary he should "stick to the truth as to what the story was."

Regarding the first of the five grounds McCreary was asserting in support of his request for the appointment of new counsel for the purpose of bring a new trial motion─Kinchen's decision not to call a witness McCreary thought she should have

41

called—McCreary told the court he did not recall whether Kinchen explained her reasons for not calling the witness.

Regarding his second claimed ground for a new trial motion, McCreary acknowledged that during jury selection he did not recognize the juror he said he recognized after trial when the jury was about to return its verdicts. Kinchen informed the court that McCreary first told her about the juror *after* the verdict came in. Kinchen indicated that she followed up and two investigators interviewed the juror, who acknowledged he was a customer at the store where McCreary had worked, but stated he did not recall having any interaction with McCreary and he did not recognize him. Kinchen also informed the court the juror told the investigators that he did not know anybody at the store and that he was very attentive about who the parties in this case were because he was looking for any reason to get off the jury and he could not find one. McCreary, however, told the court, "I think over a period of seeing the guy every week for several years, he would build a bad opinion of me." Kinchen added that her investigators questioned the juror, and he said he did not know anyone at the store.

The court turned to McCreary and, referring to his request for the appointment of new counsel for the purpose of bring a new trial motion, told him, "So that creates a problem for what your request is; okay?". McCreary replied, "Yes, sir." The court explained: "There's . . . a problem with that in the sense that you didn't bring this to anybody's attention until the verdict was read, or right before the verdict was read." The court added, "I'm kind of concerned about the fact that you sat here for over a month and never brought it to anybody's attention."

42

Shortly thereafter, the court told McCreary, "[Y]our contact with that guy was so minimal that you sat here in the same courtroom with a guy who would decide your fate for over a month and [you] didn't recognize him. So that creates some concern for me that if there was all this ill will that he harbored towards you, you would have immediately said, 'Oh, my gosh. We have to get that guy off the jury because he doesn't like me.' And that never happened during jury selection[ or] during the entire course of the trial."

Regarding the third ground─Kinchen's tactical decision to not ask the court to admonish the jury when it heard near the end of the trial one reference to McCreary's having served time in prison─Kinchen explained to the court that, although she objected, in her opinion "it was too late in the trial" to ask that the jury be admonished. Indicating agreement with Kinchen's statement, the court observed that lawyers in similar situations frequently "weigh out in their head, 'Okay. Do I want to make a motion to strike and draw attention to it? It might not have been something anyone even saw. Or let it slide and not draw attention to it."

The court then addressed McCreary's fourth asserted ground for a new trial: Kinchen's failure to object and ask that the jury be admonished during the prosecutor's closing arguments when the prosecutor reenacted what she thought Rodriguez was doing and saying in the backseat of Withers's car. The court stated it believed the prosecutor's argument was based on someone's testimony, and it observed attorneys commonly "get passionate when they make their arguments." Kinchen told the court McCreary's concern

43

was that there was no testimony regarding what Rodriguez said in the backseat of the car before she was shot and that the prosecutor "made it up."

Prompted by the court, Kinchen acknowledged the prosecutor's reenactment occurred during the prosecutor's closing argument. The court then told Kinchen and McCreary, "[W]hat the attorneys say is not evidence in opening and in closing." Kinchen responded, "Well, [McCreary] has a concern that the jury was not notified that what was said during the [prosecutor's] closing was not evidence." The court replied, "Oh no. I instructed them multiple times [that] what attorneys say is not evidence. I do that in every trial, and it's one of the actual jury instructions that I read to the jury."[12] When the court started looking at the jury instructions it gave in this case, McCreary said, "I believe you, Your Honor."

The court also addressed McCreary's fifth and last asserted ground for a new trial: Kinchen's failure to object to trial evidence regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing that she died immediately when she was shot. Kinchen argued that, at trial, the prosecutor violated the preliminary hearing agreement about how quickly Rodriguez died, adding that the prosecutor "went with" what Kinchen asserted was Withers's testimony that Rodriguez did not die immediately. Indicating it did not see how McCreary was prejudiced, the court told Kinchen, "I imagine the stipulation was for purposes of preliminary examination and any motions that

_____

12    The court instructed the jury under CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

44

flowed therefrom."  Kinchen replied, "Correct."  Noting that the "stipulation was a limited stipulation that was designed only to get through the preliminary hearing," the court explained that "there's no legal grounds . . . by which I could hold the [prosecutor] to that stipulation for purposes of trial when it was . . . only limited to the preliminary hearing."  Indicating that all of the four prior asserted grounds for the new trial motion McCreary wanted to bring were insufficient, the court stated with respect to the fifth ground, "So that's insufficient grounds as well."

a.  *Court's findings and rulings on McCreary's two postverdict motions*

i. *McCreary's Marsden motion*

The court first ruled on McCreary's *Marsden* motion, which was based on his general claim that the representation Kinchen had provide him was inadequate.  Still outside the presence of the prosecutor, the court explained that "[r]ight now the issue of the *Marsden* hearing is whether [there are] sufficient grounds to appoint other counsel based on [Kinchen's alleged] incompetence, inadequate representation, failure to properly investigate, having contrary interest in Mr. McCreary . . . ."

The court denied McCreary's *Marsden* motion, noting that Kinchen was "a very experienced trial lawyer" who had "devoted her career to criminal defense. " The court found that Kinchen "was not incompetent in any way," and she "more than adequately represented [McCreary]."  The court also found Kinchen had "completely investigat[ed] everything."  As an example, the court noted that when McCreary told Kinchen about the juror he claimed he belatedly recognized, "[s]he sent an investigator out to the [juror's] house," the juror "sent [the court] a letter because of it," and she "subpoenaed documents

45

from the store" where McCreary worked and allegedly had interracted with the juror. The court told McCreary that Kinchen had "aggressively represented you throughout the trial." The court then reviewed some of the incriminating evidence supporting the jury's finding that McCreary was the shooter. Stating that Kinchen "was handed a case with the evidence and the facts that she can't change," the court found she "did an excellent job with what she had to work with."

ii. *McCreary's motion for appointment of new counsel to represent him in bringing a motion for a new trial*

After denying McCreary's *Marsden* motion, the court told Kinchen, "[T]he next question is do we appoint counsel to file a motion for new trial that you can't file because of a conflict?" Seeking clarification the court asked her, "So it's your position then that for a motion for new trial to be filed, it would have to be investigated by new counsel to determine if there was ineffectiveness of counsel; correct?" Kinchen replied, "Correct, based on their assessing the evidence in a different way than I assessed [it]." Following further discussion with Kinchen and McCreary regarding the five grounds for a new trial that he was asserting, the court recessed the hearing for a few minutes in order to bring back the prosecutor.

When the prosecutor returned, the court told her that "[McCreary's] *Marsden* motion ha[d] been denied" and "[t]he next issue [was] whether or not the Court should appoint substitute counsel to investigate certain issues regarding considering a motion for a new trial." The court stated it had researched the issue.

Citing and discussing three cases—*People v. Sanchez* (2011) 53 Cal.4th 80, *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*), and *People v. Stewart* (1985) 171 Cal.App.3d 388 (*Stewart*), disapproved on other grounds in *Smith*, at pages 694, 696—the court denied McCreary's motion for appointment of new counsel to represent him in bringing a motion for a new trial "for the same reason" it had denied McCreary's *Marsden* motion. Noting it had heard from Kinchen, the court stated, "I won't go into detail now that we are in the presence of the prosecutor, but [*McCreary*] *has not made a colorable claim of ineffective assistance of counsel or any other grounds for a new trial motion*." (Italics added.) Citing *Sanchez*, *supra*, 53 Cal.4th 80, the court found "there was no showing during the *Marsden* hearing that would indicate in any way that [McCreary's] right to counsel has been substantially impaired, either during the trial or now that we are in a [postconviction] status." The court stated "there weren't any credibility issues or contradictory statements between [McCreary] and [Kinchen]" and Kinchen was "quite credible," and it "accept[ed] her representations and her explanations that [she] made during the *Marsden* hearing."

2. *Applicable legal principles*

a. *Ineffective assistance of counsel*

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland, supra,* 466 U.S. at pp. 684-685; *People v. Frye* (1998) 18 Cal.4th 894, 979 (*Frye*).) To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing

47

professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687-688, 691-692; *Frye*, at p. 979.) To demonstrate prejudice, a defendant asserting an ineffective assistance claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, at pp. 693-694; *Frye*, at p. 979.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

Strickland explained that "[j]udicial scrutiny of counsel's performance must be *highly deferential* [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689, italics added.) *Strickland* also explained that reviewing courts "must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Ibid*., italics added.)

b. *Substitution of new court-appointed counsel*

"Criminal defendants are entitled to competent representation. If a defendant cannot afford to hire an attorney, one must be appointed for the defendant." (*Smith*, *supra*, 6 Cal.4th at p. 690.)

"The seminal case regarding the appointment of substitute counsel is *Marsden*, *supra*, 2 Cal.3d 118, which gave birth to the term of art, a '*Marsden* motion.'" (*Smith*, *supra*, 6 Cal.4th at p. 690.)

In *Marsden*, the California Supreme Court explained that "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney *during the trial* is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden*, *supra*, 2 Cal.3d at p. 123, italics added.) *Marsden* "established . . . that the trial court must give the defendant the opportunity to explain the reasons for desiring a new attorney." (*Smith*, *supra*, 6 Cal.4th at p. 690, citing *Marsden*, at pp. 123-125.) The *Marsden* court explained that "the trial court cannot thoughtfully exercise its discretion in this matter without listening to [the defendant's] reasons for requesting a change of attorneys." (*Id.* at p. 123.)

In *Smith*, our supreme court explained that "substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would *substantially impair the right to assistance of counsel* [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Smith*, *supra*, 6 Cal.4th at p. 696, italics added.) The *Smith* court stated, "This is true *whenever* the motion for substitute counsel is made." (*Ibid*.) Thus, it concluded, "a defendant is entitled to appointment of substitute

49

counsel upon a proper showing posttrial or postconviction as well as pretrial." (*Id.* at p. 693.)

Of particular importance here, the *Smith* court held that "'[w]hen, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request.'" (*Smith*, *supra*, 6 Cal.4th at p. 693, quoting *Stewart, supra,* 171 Cal.App.3d at p. 495.) The *Smith* court also held that "'[i]f the claim of inadequacy relates to *courtroom events that the trial court observed*, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to *matters that occurred outside the courtroom*, and the defendant makes a "*colorable claim*" *of inadequacy of counsel*, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.'" (*Smith*, at pp. 692-693, quoting *People v. Diaz* (1992) 3 Cal.4th 495, 574, italics added.)

Quoting *Stewart*, *supra*, 171 Cal.App.3d at pages 396-397, *Smith* explained that a "'defendant presents a *colorable claim* that he was ineffectively represented at trial,'" and thus the trial court must appoint new counsel, if the defendant "'credibly establishes to the satisfaction of the court the possibility that trial counsel failed to perform with reasonable diligence and that, as a result, a determination more favorable to the defendant might have resulted in the absence of counsel's failings.'" (*Smith*, *supra*, 6 Cal.4th at p. 691, citing (in addition to *Stewart*) *People v. Dennis* (1986) 177 Cal.App.3d 863, 871.)

50

*Smith* clarified that "[w]hen the court in *Stewart*, *supra*, 171 Cal.App.3d at pages 396-397, referred to the defendant making a 'colorable claim,' it did not state a lesser standard than in *Marsden*, or create a new and different right than that stated in *Marsden*; it merely applied the *Marsden* rule to a particular factual situation, and employed somewhat different language." (*Smith*, *supra*, 6 Cal.4th at p. 693.)

Thus, the standard expressed in *Marsden* and its progeny and the "colorable claim" standard expressed in *Stewart* and approved in *Smith* are the same standard. (*Smith*, *supra*, 6 Cal.4th at p. 693.) Thus, *Smith* explained, under this one standard─whether it is referred to as the *Marsden* standard or the *Stewart* "colorable claim" standard─"substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Smith*, *supra*, 6 Cal.4th at p. 696.)

3. *Analysis*

McCreary's principal contention is that the court erred in denying his postverdict motion for the appointment of new counsel to represent him in bringing a written motion for a new trial. We reject this contention.

51

Citing section 1202 (discussed, *post*) and complaining that Kinchen's "refusal to file a motion for a new trial [represented] an irreconciliable conflict with [him]," McCreary first contends the court's refusal to grant his motion for appointment of new counsel to represent him in bringing a motion for a new trial "resulted in the involuntary relinquishment of [his] right to present a motion for a new trial." Without citation to any authority, he asserts "[t]he court, in refusing to appoint a conflict-free attorney who could bring such a motion, by extension also refused to hear [his] motion." This contention is unavailing.

Section 1202 provides in part: "*If the court shall refuse to hear a defendant's motion for a new trial* or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial." (Italics added.)

Thus, if a trial court "refuse[s] to hear a defendant's motion for a new trial," the defendant is "entitled to a new trial" under section 1202. (§ 1202.)

On the facts presented here, McCreary's reliance on section 1202 is misplaced. The California Supreme Court has recognized that a defendant's new trial motion may be made orally. (*People v. Braxton* (2004) 34 Cal.4th 798, 814.) Here, the record of the *Marsden* hearing (discussed, *ante*) that the court conducted outside the presence of the prosecutor shows the court heard orally from both McCreary and Kinchen *all* of the grounds McCreary would have asserted in a written new trial motion. The court essentially heard McCreary's oral motion for a new trial and, thus, we conclude it did not "refuse to hear" McCreary's new trial motion within the meaning of section 1202.

52

We also conclude the court properly denied McCreary's motion for the appointment of new counsel to represent him in bringing a written motion for a new trial. As already discussed, a defendant has no absolute right to more than one appointed attorney. (*Marsden*, *supra*, 2 Cal.3d at p. 123.) Furthermore, "a trial court is not bound to accede to a request for substitute counsel unless the defendant makes a '"sufficient showing . . . that the right to the assistance of counsel would be substantially impaired"'" if the original attorney continued to represent the defendant." (*Sanchez*, *supra*, 53 Cal.4th at p. 87, quoting *Marsden*, at p. 123; see *Smith*, *supra*, 6 Cal.4th at p. 696.)

The record of the *Marsden* hearing (discussed, *ante*) shows the court gave Kinchen and McCreary a full opportunity to present and discuss not only the five grounds for a new trial that McCreary asserted in support of his motion for new counsel to represent him in bringing a written new trial motion, but also his two additional complaints about Kinchen's performance at trial. The record also shows McCreary failed to meet his burden of demonstrating to the court that his right to the assistance of counsel would be substantially impaired if the court denied his request for new appointed counsel to represent him in bringing a written new trial motion. The record further supports the court's determination that none of the five grounds McCreary asserted was sufficient to warrant the granting of a new trial, and thus none was sufficient to warrant granting McCreary's request for new counsel.

Specifically, regarding the first ground concerning Kinchen's decision not to call the witness she knew about before trial, neither McCreary nor Kinchen, when given the opportunity, attempted to explain how the witness's testimony would have helped

McCreary's defense, and McCreary informed the court he did not recall whether Kinchen explained to him her reasons for not calling the witness.

Regarding McCreary's second asserted ground for a new trial, which concerned his claimed belated posttrial recognition of a juror he thought might have formed a "bad opinion" of him, the record shows Kinchen thoroughly investigated the issue and sent investigators to interview the former juror. In any event, the record shows the juror in question was dismissed for cause early in the trial proceedings. Specifically, on May 12, 2014, during a hearing outside the presence of the jury, Kinchen told the court, after consulting with McCreary, that the person in question had been "excused for cause" and was no longer on the jury panel. The court asked McCreary, "Is that correct[,] Mr. McCreary?" McCreary responded, "Yes, sir."

Regarding McCreary's third asserted ground concerning Kinchen's decision to not ask the court to admonish the jury when it heard near the end of the trial one reference to McCreary's having served time in prison, the record shows this was a sound tactical decision. Specifically, at the hearing on McCreary's request for new counsel, Kinchen explained to the court that, in her opinion "it was too late in the trial" to ask that the jury be admonished. Indicating agreement with Kinchen's statement, the court observed that lawyers in similar situations frequently "weigh out in their head, 'Okay. Do I want to make a motion to strike and draw attention to it? It might not have been something anyone even saw. Or let it slide and not draw attention to it[.]"

Thus, the record shows Kinchen made a tactical decision to not request an admonishment because she did not want to draw further attention to evidence showing

54

McCreary had served time in prison. Our scrutiny of Kinchen's performance "must be *highly deferential*." (*Strickland*, *supra*, 466 U.S. at p. 689, italics added.) As a reviewing court, we "must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Ibid*., italics added.) We conclude McCreary has failed to meet his heavy burden of rebutting the strong presumption that Kinchen's decision to not request an admonishment was a sound trial tactic.

McCreary's fourth asserted ground also did not warrant a new trial or appointment of new counsel. As noted, McCreary claimed he was entitled to a new trial because Kinchen had failed to object and ask that the jury be admonished during the prosecutor's closing arguments when the prosecutor reenacted what she thought Rodriguez was doing and saying in the backseat of Withers's car. The court did not err in finding this claimed ground was insufficient. The court correctly told Kinchen and McCreary that it had "instructed [the jury] multiple times [that] what attorneys say is not evidence." The record shows the court instructed the jury under CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening and *closing statements*, the attorneys discuss the case, but their remarks are not evidence." (Italics added.) We presume the jury in this case understood and followed the instructions the court gave under CALCRIM No. 222 (see *People v. Brady, supra,* 50 Cal.4th at p. 566, fn. 9), and there is nothing in the record to rebut this presumption.

55

Finally, McCreary's fifth asserted ground did not warrant a new trial or appointment of new counsel. As noted, McCreary claimed he was entitled to a new trial because Kinchen failed to object to evidence at trial regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing that she died immediately when she was shot. Finding this was "insufficient grounds," the court told McCreary and Kinchen it did not see how McCreary was prejudiced by Kinchen's failure to object, and explained that there were "no legal grounds . . . by which [it] could hold [the prosecutor] to that stipulation for purposes of trial when it was . . . only limited to the preliminary hearing."

Based on the foregoing, we conclude McCreary has failed to show a substantial impairment of his right to the assistance of counsel. (See *Sanchez*, *supra*, 53 Cal.4th at p. 87; *Smith*, *supra*, 6 Cal.4th at p. 696.) Accordingly, we also conclude he has failed to show the court abused its discretion or violated his due process right to a fair trial in denying his motion for the appointment of new counsel.

B. *Evidence That McCreary Had Been to Prison*

Next, McCreary claims the court's admission of "irrelevant and prejudicial evidence showing that [he] had been to prison denied [him] his right to a fundamentally fair trial, in violation of his right to due process of law." This claim is unavailing.

1. *Background*

During the trial two brief references were made to McCreary's having been in prison. The first reference occurred early in the trial during Gallentine's testimony about the incident at Withers's house when Rodriguez was screaming and yelling about having

56

been raped and given bad dope. Specifically, Gallentine testified Rodriguez told McCreary he (McCreary) had given her the bad drugs and that McCreary reacted by telling Rodriguez, "Don't talk to me like that. I don't know what you're talking about." Gallentine also testified that McCreary told Rodriguez, "*I been to prison. I ain't no lame.*" (Italics added.)

Outside the presence of the jury during a break, McCreary's counsel, Kinchen, objected and asked the court to admonish the jury. The court granted Kinchen's request for an admonishment and told Gallentine, "Don't mention anything about either defendant['s] being in prison." Soon thereafter the court also admonished the jury: "There was an answer earlier by the witness in which he stated that Mr. McCreary said, 'I ain't no lame. I have been to prison.' The jury is ordered to disregard that portion of the answer and it is stricken from the record. Treat it as though you never heard it."

The second reference to McCreary's having been to prison occurred near the end of the trial during the prosecutor's cross-examination of McCreary. The prosecutor played for the jury an audiotape of Detective DuGal's lengthy interview of McCreary. The transcript of the police interrogation was marked as exhibit 131 and copies of the transcript were distributed to the jurors. While the audiotape played, the prosecutor projected the transcript for the jury to follow along.

At some point before the mid-morning recess was taken at 10:34 a.m., while the audiotape was playing and the transcript was being projected, the prosecutor interjected, "Okay. Your Honor, I need to fast-forward a short portion." She then stated, "You know what, Judge? One second. The recording isn't matching up with . . . the transcript. Just a

57

moment, Your Honor. I'll make sure—" The prosecutor then said, "I think it's okay now." The playing of the audiotape resumed.

During the lunch recess, McCreary's counsel put on the record that "some parts of the transcript . . . talked about Mr. McCreary *being in prison or having been sentenced to prison and done prison time*. I think that those parts should be deleted from the final version [of the transcript] that goes to the jury. [¶] Obviously *we can't unring the bell now*. But any further part of the transcript and recording should be cleaned up for the jury to hear. I know that [the prosecutor] did try to get most of it and some of it apparently still seeped through about references to prison and serving prison time." (Italics added.)

The prosecutor responded by telling McCreary's counsel, "[T]he transcript you have is the original transcript. The one the jurors are watching, *there is one reference to* [*McCreary's*] *saying he was in prison*. That's been—it came up and I fast-forwarded through it. The rest of the transcript is clean." (Italics added.)

During the postverdict *Marsden* hearing (discussed, *ante*), McCreary's counsel told the court she did not ask the court to admonish the jury about the second reference to McCreary's having been in prison because "it was too late in the trial to do that."

2. *Standard of review*

A trial court's exercise of discretion in admitting or excluding evidence is reviewed on appeal for abuse of that discretion and will not be disturbed "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently

58

absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 9-10.)

"The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.)  A trial court's error under state law in the admission or exclusion of evidence following an exercise of discretion is properly reviewed for prejudice under *Watson, supra,* 46 Cal.2d at page 836. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)  Under the *Watson* harmless error test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, at p. 836.)

   3. *Analysis*

McCreary's claims of evidentiary and constitutional error are based on his assertion that the jury improperly heard Gallentine's comment that McCreary had been in prison, and it saw a similar reference to his having been in prison in the projected police interview transcript it watched while the prosecutor played the audio recording of the interview.  McCreary's claims are unavailing.

Assuming without deciding that the jury hearing Gallentine's comment and seeing the transcript reference to his having been in prison were prejudicial, we conclude any such prejudice was cured when, following Gallentine's comment, the court admonished the jury and ordered the comment stricken from the record, making it clear to the jury that the reference to McCreary's having been in prison had nothing to do with the case. Specifically, the court told the jury, "There was an answer earlier by the witness in which

59

he stated that Mr. McCreary said, 'I ain't no lame. I have been to prison.' The jury is ordered to disregard that portion of the answer and it is stricken from the record. Treat it as though you never heard it."

Even if we were to assume the court's admonishment did not cure any prejudice that resulted from the two references to McCreary's having been in prison, we conclude he has failed to demonstrate it is reasonably probable he would have obtained a more favorable result in the absence of the claimed evidentiary error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) First, it is unlikely the jury would have found it shocking and would have been influenced by learning that McCreary had been in prison, given the evidence (discussed more fully, *ante*, in the factual background) showing that nearly everyone involved in the events that led up to Rodriguez's murder, including McCreary, used methamphetamine, that some had criminal records, and that some were in custody or had been in prison. (See *People v. Price* (1991) 1 Cal.4th 324, 433 [defendant convicted of murder failed to show prejudice under the *Watson* harmless error standard as a result of erroneous admission of irrelevant evidence that the prison gang to which defendant belonged was affiliated with organized crime; trial court found "the jury was unlikely to be shocked or influenced" by that evidence]). The jury heard evidence that Withers had been incarcerated and he was on parole when he was arrested. McCreary makes no attempt to explain how the jury learning he had been to prison would have caused the jury to be more likely to find that he, not Withers, shot and killed Rodriguez.

60

Second, the evidence of McCreary's guilt was very strong in that it showed he planned Rodriguez's murder and shot her, and he essentially admitted his culpability during the recorded phone call he received from Withers.

For the foregoing reasons, we conclude McCreary has failed to show the claimed evidentiary errors were prejudicial or violated his due process right to a fair trial.[13]

C. *Firearm enhancement* (§ *12022.53*(*d*))

McCreary also contends the 25-year-to-life firearm sentence enhancement imposed under section 12022.53(d) must be stricken because (1) the count 1 verdict form did not contain the language in that statute requiring a finding of an intentional discharge of a firearm, and thus (2) "[i]t cannot be determined beyond a reasonable doubt that each of the 12 jurors found that [he] intentionally discharged the firearm." We reject this contention.

Section 12022.53(d) provides in part that "any person who, in the commission of a felony [], *personally and intentionally discharges a firearm* and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Italics added.)

The count 1 verdict form returned by the jury states in part: "We, the jury in the above entitled cause, further find the defendant, JEFFREY McCREARY, "DID [¶]

---

13   In light of our conclusion, we need not reach the merits of the Attorney General's assertion that McCreary forfeited his claim of error with respect to the prison reference in the police interview transcript because his counsel "raised no objection and did not request the court admonish the jury."

61

[*p*]*ersonally* [*u*]*se a firearm* to wit: 9mm Caliber semi-automatic firearm within the meaning of Penal Code section 12022.53(d)." (Italics added.)

McCreary's contentions are unavailing. First, as the Attorney General correctly argues, McCreary forfeited his claim by failing to object at trial. "An objection to jury verdict forms is generally deemed waived if not raised in the trial court." (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) A "defendant waive[s] any defect in the verdict forms by failing to object at trial." (*People v. Jones* (1997) 58 Cal.App.4th 693, 715, citing *People v. Toro*, supra, 47 Cal.3d at p. 976, fn. 6 & *People v. Lewis* (1983) 147 Cal.App.3d 1135, 1142.) Here, McCreary acknowledges "[i]t is true that [he] did not object to the verdict form."

Second, McCreary's claims fail on the merits. The information properly alleged in count 1 that McCreary "intentionally and personally discharged a firearm, to wit: a semi-automatic handgun, and proximately caused great bodily injury and death to a person (other than an accomplice), within the meaning of [section] 12022.53(d)." The court read the section 12022.53(d) enhancement allegation to the jury. The court later repeated the language in that allegation when it instructed jury under CALCRIM No. 3149 that, if it found McCreary guilty of murder as charged in count 1, it must then decide whether the prosecution had proved beyond a reasonable doubt the additional allegation "that [McCreary] personally and *intentionally discharged a firearm* during that crime causing great bodily injury or death." (Italics added.) We presume the jury in this case understood and followed the instructions the court gave under CALCRIM No. 3149 (see

62

*People v. Brady, supra,* 50 Cal.4th at p. 566, fn. 9), and there is nothing in the record to rebut this presumption. Accordingly, we conclude that notwithstanding the defect in the count 1 verdict form, the jury found that McCreary, in murdering Rodriguez, intentionally discharged a firearm within the meaning section 12022.53(d).

D. *Denial of McCreary's Romero Motion*

Last, McCreary contends the court abused its discretion in denying his *Romero* motion to strike his two 1989 robbery convictions, which were strikes for purposes of the Three Strikes Law. We reject this contention.

1. *Background*

The court found to be true allegations in the information that McCreary had suffered two 1989 prior strike convictions within the meaning of the Three Strikes Law. The strikes involved two counts of robbery against two victims. McCreary was 19 years of age when he suffered those convictions in 1989.

Before sentencing, McCreary filed his four-page *Romero* motion to strike his two prior strike convictions. McCreary argued that in the years following those convictions he "did not commit any new serious and or violent offenses," and he "struggled from addiction to controlled substances throughout his adult life." He also argued the punishment he was facing under the Three Strikes Law was disproportionate to his criminal history, and he had "display[ed] remorse for his criminal conduct," "demonstrated an ability to conduct himself as a law abiding citizen for a significant period of time," and "demonstrate[d] a willingness and ability to rehabilitate himself."

63

At McCreary's sentencing hearing, the court denied McCreary's *Romero* motion, stating, "[G]iven the seriousness of the . . . strike priors and the seriousness of the case at hand, the Court denies the motion to strike the priors." The court then sentenced McCreary to an aggregate state prison term of 100 years to life, consisting of an indeterminate term of 25 years to life for his first degree murder conviction, which the court tripled to 75 years to life under the Three Strikes Law, plus a consecutive indeterminate term of 25 years to life for the firearm enhancement (§ 12022.53(d)).

2. *Applicable legal principles*

In *Romero*, *supra*, 13 Cal.4th at pages 504 and 529-530, the California Supreme Court held that section 1385, subdivision (a)[14] permits a court acting on its own motion and "in furtherance of justice" to strike prior felony conviction allegations in cases brought under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). Although the Legislature has not defined the phrase "in furtherance of justice" contained in that subdivision, the California Supreme Court has held that this language requires a court to consider both the ""constitutional rights of the defendant, and the interests of society represented by the People"" (italics omitted) in determining whether to strike a prior felony conviction allegation. (*Romero*, *supra*, 13 Cal.4th at p. 530.)

---

14     Section 1385, subdivision (a) provides in part that a trial court "may, either of [its] own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes."

In *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*), the California Supreme Court explained that, in determining whether to strike or vacate a prior strike allegation or finding under the Three Strikes law "in furtherance of justice" pursuant to section 1385, subdivision (a), the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

In *People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*), our high state court held that a trial court's decision not to dismiss a prior strike conviction allegation under section 1385, subdivision (a) is reviewed under the deferential abuse of discretion standard. (*Carmony*, at pp. 371, 376.) *Carmony* explained that "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.)

On appeal we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien*, *supra*, 4 Cal.4th at p. 976.)

3. *Analysis*

Applying the deferential abuse of discretion standard, as we must (*Carmony, supra*, 33 Cal.4th at p. 371), we conclude McCreary has failed to meet his burden on appeal of showing that the court's denial of his *Romero* motion was an abuse of discretion and that he should be deemed to be outside the spirit of the Three Strikes law. The record

shows the court considered the factors discussed in *Williams*: "[T]he nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects" (*Williams*, s*upra*, 17 Cal.4th at p. 161).

As noted, McCreary claims his sentence is disproportionate to his criminal history because, during the years following his two 1989 robbery convictions, he "demonstrated an ability to conduct himself as a law abiding citizen for a significant period of time," and he had "demonstrate[d] a willingness and ability to rehabilitate himself." This claim is belied by his criminal history as detailed in the probation report, which shows that McCreary was convicted in 1992 of being a felon in possession of a firearm and possession of stolen property, for which he was sentenced to eight years in state prison. After he was released, he twice violated the terms of his parole and was returned to prison to finish his term. He was finally discharged from parole in 2004. Meanwhile, in 2003, he was convicted of possession of tear gas and sentenced to three years' court probation. In April 2009 he was convicted of possession of a switchblade knife and sentenced to three years' court probation, but his probation was revoked. Less than three years later, in early 2012 when he was 42 years of age, McCreary murdered Rodriguez.

The foregoing record of McCreary's criminal recidivism and the evidence establishing the willful and premeditated nature of his latest and most violent crime amply support the court's finding that he falls squarely within the spirit of the Three Strikes law. McCreary's claim that the court abused its broad discretion is meritless. Accordingly, we affirm the court's order denying McCreary's *Romero* motion.

66

DISPOSITION

The judgments are affirmed.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.